1. CARRIERS (§ 100*)—CARRIAGE OF FREIGHT—CHARGES—DEMURRAGE—RULES OF CARRIER.

A carrier, governed by a rule that freight shipped direct or reconsigned for delivery would be held in warehouses free of charge for not exceeding three days, and by a rule that freight in car loads which was, at the request of consignee, held for orders would be held free of charge for ten days, if unloaded from cars awaiting orders, and if subsequently ordered to designated points the freight would be held subject to the prior rule and by a rule declaring that car load freight which was unloaded by the carrier to release needed equipment would be subject to the same storage charges as would accrue under car demurrage rules and track storage charges, etc., received for transportation, with instructions to notify consignee, a car load of flour. The consignee ordered 210 sacks of the 350 to a designated point and paid accrued freight charges on the entire amount. The carrier, on directions from the consignee, removed the remaining sacks to a terminal, but the notice of their arrival there was not received by the consignee. Held, that the consignee could assume that the carrier, on the arrival of the 140 sacks, would hold them free of charge for three days and if not then removed would store them in a warehouse at his expense, and the carrier could not collect demurrage charges merely because it placed the car on the delivery tracks at the terminal awaiting removal by the consignee, who was liable only for warehouse charges.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 427–433; Dec. Dig. § 100.*]

2. COMMERCE (§ 88*)—RES JUDICATA—DECISION OF INTERSTATE COMMERCE COMMISSION.

A decision of the Interstate Commerce Commission that demurrage charges assessed by a carrier were collectible, but that the Commission had no means of determining the reasonableness of the charges, and that if the consignee wished to pursue the matter he should file a formal complaint, was not res judicata on the question of the amount of demurrage and storage charges which the carrier might collect from the consignee on a different shipment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 139–141; Dec. Dig. § 88.*]

3. CARRIERS (§ 197*)—CARRIAGE OF FREIGHT—LIABILITY OF CARRIER.

Where a consignee tendered to the carrier the full amount of the charges then properly due and demanded possession of the freight, which demand the carrier refused, the lien of the carrier was extinguished, and it became liable to the consignee in replevin or trover.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 891–900; Dec. Dig. § 197.*]

4. CARRIERS (§ 132*)—CARRIAGE OF FREIGHT—LIABILITY OF CARRIER.

Where flour in possession of a carrier was destroyed by worms after the carrier's wrongful refusal to deliver to the consignee, and there was nothing justifying an inference that the destruction was due to any inherent condition of the flour rather than dampness or a cause arising from a defect in the place of storage, a presumption of the carrier's negligence, rendering it liable, arose.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 578–582, 605; Dec. Dig. § 132.*]

Submission of controversy between Herbert Neustadt, individually and as executor of Otto Neustadt, deceased, comprising the copartner-

ship firm of Neustadt & Co., plaintiff, and the Lehigh Valley Railroad Company and another, defendants. Judgment for plaintiff.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

David B. Luckey, of New York City (John J. Schwartz, of New York City, on the brief), for plaintiff.

Stewart C. Pratt, of New York City, for defendant.

HOTCHKISS, J. Prior to October 26, 1910, the Cambridge Milling Company shipped from Cambridge, Minn., to New York, via the defendant railroad company a car load consisting of 350 sacks of flour, consigned to order, with instructions to notify plaintiffs on arrival. The flour arrived at the railroad's Jersey City terminal on September 27th, and plaintiffs were duly notified. Shortly prior to September 27th, plaintiffs ordered 210 sacks to Martins Siding, at Jersey City, and paid accrued freight charges on the entire 350 sacks. On October 19th the railroad company, pursuant to directions from plaintiffs, removed the remaining 140 sacks to the Atlantic terminal of the dock company (defendants' agent). The sacks arrived at the terminal October 26th, and plaintiffs were duly notified. The car was thereupon placed upon the delivery tracks of the terminal awaiting removal of its contents by plaintiffs. Apparently plaintiffs did not receive the arrival notice and for some unexplained reason were unaware of the actual arrival of the car or of its presence on the delivery tracks after the free days mentioned in paragraph 1 of the rules hereinafter quoted. Plaintiffs rested under the belief that, when the flour arrived, it would be warehoused by the railroad company, and they apparently believed that this had been done, until December 20th, when they were notified by the dock company that the car containing the flour was on hand unclaimed, and subject to accruing car service and track storage charges. On the same day plaintiffs declined to pay accrued charges at this rate on the ground that under the aforesaid rules the flour should have been warehoused and there held and not permitted to remain in the cars on the terminal tracks subject to car service and track storage charges. The dock company declined to accede to this view and refused delivery of the flour until the charges demanded were paid. On the same day (December 20th) plaintiffs tendered the amount of all storage and other charges computed according to their construction of the rules and demanded the 140 bags, which demand was refused. Thereafter, and prior to March 29, 1912, plaintiffs repeated their tender and demand, which was refused, although the defendants at all times expressed willingness to surrender the flour on payment of the charges claimed by them to be due. The 140 bags were left in the car in the terminal yard until January 27, 1911, on which date the dock company, acting under orders from the railroad company, removed the bags from the car and stored them in one of its warehouses. The interstate character of the shipment is conceded. After plaintiff's first tender and demand for its possession, and while stored in the warehouse, the flour was destroyed by worms.

The defendants claim that the shipment was subject to car service

and track storage charges from October 25th, when they notified plaintiffs of the car's arrival, to January 27th, when the flour was stored, and to storage charges at the same rate from January 27th to April 15th (a mutually agreed date), and also to certain charges for handling, all aggregating $332.50, for which they seek a personal judgment against plaintiffs. The rules to which reference has been made were filed with the Interstate Commerce Commission and posted as part of the railroad company's tariff, and are concededly part of the contract under which the flour was transported. They read as follows:

Rules Regarding Storage of Freight at New York, N. Y., Brooklyn, N. Y., Jersey City, N. J., Jersey City (National Storage Docks), N. J., and Jersey City (Communipaw Avenue), N. J.

All property held by this company will be so held solely at owner's risk (subject to transportation storage and other charges), under the following rules, conditions and charges:

These rules do not apply on hay, straw or excelsior, empty packages, freight in bulk, or other freight upon which car service or elevator storage charges are applicable.

(1) Freight shipped direct or reconsigned to New York, N. Y., Brooklyn, N. Y., Jersey City, N. J., and Jersey City (Communipaw avenue), N. J., for delivery to consignees at these points will be held there in our warehouses free of charge, not exceeding three days, Sundays, legal holidays and date of arrival not included. Any such freight not removed within the time specified will be stored in public warehouses at owner's cost and risk, including expense of cartage. * * *

(3) Freight in car loads consigned direct for station delivery in New York, N. Y., or Brooklyn, N. Y., which is, at request of consignee, held at Jersey City, N. J., for orders, will be held free of charge for ten days, Sundays, legal holidays and day of arrival not included, if unloaded from cars awaiting orders; if subsequently ordered to a New York, N. Y., or Brooklyn, N. Y., station it will there be subject to the conditions of rule 1. The entire car load must be reordered at one time and to one station. * * *

(9) Car load freight, which is unloaded by the Lehigh Valley Railroad Company for the purpose of releasing needed equipment, will be subject to storage charges the same as would have accrued under car demurrage rules and track storage charges, if any, had the freight remained in the car, which charges are provided for in I. C. C. No. B—1461 (car demurrage rules) and page twenty-one of tariff I. C. C. No. B—4510 (track storage charges) supplements thereto and reissues thereof.

Brooklyn deliveries (Continued), New York Dock Company, Atlantic Terminal

Atlantic Terminal, Brooklyn, N. Y., located on the water front between Hamilton avenue and Walcott street, Brooklyn, N. Y. At this terminal all car load shipments of general merchandise (except as noted on pages 21 to 23) are received. This terminal is equipped with the following special facilities: A special yard for the delivery of hay at the foot of King street. Track scale of 60 tons capacity. Crane of 8 tons capacity. Track delivery of C. L. freight.

Railroad tracks with two float bridge approaches for transferring cars from float to track delivery, yard, piers or warehouses. Warehouses for the storage of general merchandise as follows:

Name of Warehouses: Franklin, Clinton, Masters, Nye, McCormick.

The word "stored," when used in the above-quoted tariff, means that the freight will be removed from the car and put into warehouse, and the initials "C. L." and "L. C. L.," where used therein, means "a car load of freight and a less than car load of freight, respectively."

[1] The defendants contend that the case is governed by rule 9, which provides that "car load freight * * * unloaded by the Lehigh Valley Railroad Company for the purpose of releasing needed

144 N.Y.S.—58

equipment will be subject to storage charges the same as would have accrued under car demurrage rules and track storage charges, if any, had the freight remained in the car," which demurrage rules are also filed with the Interstate Commerce Commission and furnish the basis for the computation of the defendants' claim. They argue that the phrase "any such freight not removed within the time specified will be stored in public warehouses," etc., in rule 1, modifies all the preceding words in the rule, and that the true meaning of the entire rule is that freight in less than car load lots, reconsigned to Brooklyn points where the railroad company had warehouses of its own, would or at its election might be stored by the company in its warehouses, if any, at such points, and that the words following rule 9, "Brooklyn deliveries, New York Dock Company, Atlantic Terminal," etc., were notice to plaintiff that said terminal and the warehouse facilities afforded thereat were not owned by the company and were not included in the phrase "our warehouses" found in rule 1; that there was no obligation resting upon the railroad company on the arrival of the car at the Atlantic terminal to remove the 140 bags from the car and store them in what it claims was as to it the "public" warehouse at that point, but that it had the right at its election, and after notice to plaintiffs and failure on their part to remove the flour, to retain the same in the car subject to the regulation car service and track storage charges, and thereafter at any time at its election, and "for the purpose of releasing needed equipment," to unload and store the flour in a "public" warehouse at such terminal, subject to charges as per rule 9. The position of the plaintiff is that the shipment came under the terms of rule 3 and thus became "subject to the conditions of rule 1."

I cannot assent to the argument advanced by the company. Without stopping to analyze all of its deficiencies, not the least among which is the unauthorized assumption of certain material facts which it may not force a shipper, at his peril, to take notice of, it seems to me to be an unnatural construction of the rules and opposed as well to their plain reading.

As I construe the rules, in the light of the submitted facts, neither rule 3 nor rule 9 has any application. It is true that the car itself took exactly the course provided for by rule 3. It was "consigned direct for station delivery in New York," was "held at Jersey City, N. J., for orders," and was "subsequently ordered to  *  *  *  Brooklyn, N. Y." But rule 3 ends with the following words:

"The entire car load must be reordered at one time and to one station."

The circumstances of the ordering of the car, as distinguished from the 140 sacks, its then sole remaining contents, as stated in the submitted case, were as follows:

"The plaintiffs reconsigned and ordered the Lehigh Valley Railroad Company to forward the remaining 140 sacks of the flour to the Atlantic terminal * * * and accordingly the * * * company, acting upon the instructions so given by the plaintiffs, forwarded 140 sacks of the flour as a full carload shipment."

These words describe the plaintiffs as following the normal course naturally to be expected. They ordered the 140 sacks to be for-

warded. They were not interested in nor had they any control over the means or details of the transfer from Jersey City to the terminal. It was the privilege of the company, if it saw fit, to permit the 140 sacks to remain in the original car and thus to forward them. If, however, for some reason of its own, it chose to pursue this course and did not unload this remnant of the original car load lot and forward it in some other receptacle, I do not think it could thus force upon the shipper obligations and expenses attendant upon a full car load lot. Its claim for car service and track storage charges on account of this car amounts to $3 per day or about three-quarters of 1 per cent. per day on the value of the 140 sacks. A construction of tariff rules which would give to a carrier the option so to transport cargo as to subject the same to any such rate of charge would shock the conscience. Nor does rule 9 call for any such construction. As above stated, it expressly applies to "carload freight," not to broken lots which, for its convenience, the carrier has permitted to occupy and chosen to treat as a full car. For these reasons I do not think that rule 9 applies, and, for the reason that "the entire car load" was not "reordered" to the terminal by the shipper, rule 3 is clearly inapplicable. I think the case falls under rule 1, not by force of rule 3, as plaintiffs contend, but by virtue of rule 1 itself. The definition of "stored," as given in the last clause of the rules, is "that the freight will be removed from the car and put into warehouse."

Under rule 1, plaintiffs had the right to assume that the course of conduct therein prescribed would be followed by the company, and that, on arrival at the Atlantic terminal, the flour would be held free of charge for three days and, if not then removed, would be stored in some warehouse at plaintiffs' expense.

[2] The submitted case is preceded by a statement of facts covering another and different shipment of flour over which a similar controversy seems to have arisen between the parties, which resulted in plaintiffs, by letter, submitting their statement of facts to the Interstate Commerce Commission. On receipt of this letter, the Commission communicated its contents to the railroad company which, by letter, laid before the Commission its statement of facts and argument. The result was a letter from the Commission to plaintiffs in which they say "it is the view of the Commission that the demurrage charges assessed were properly collectible," adding that they had no means of determining the reasonableness of these charges, and, if plaintiffs wished to pursue the matter further, they would have to file a formal complaint. This ruling is claimed by defendants to settle the present controversy, because, as they assert, the company was bound by it, which fact, it argues, is res adjudicata of the question now submitted. That the company is wrong in this contention is too plain for argument.

[3] It follows that plaintiffs having on December 20th tendered to the railroad company the full amount then properly due and demanded possession of their property, which demand was refused, the lien of the railroad was extinguished, and it became liable to plaintiffs in either replevin or trover. Cass v. Higenbotam, 100 N. Y. 248, 252, 3

N. E. 189. From that moment defendants' possession was wrongful.

[4] From the submission it appears that the flour was destroyed by worms after December 20th. Nothing is stated from which any inference can be drawn that such destruction was due to any inherent condition of the flour rather than to dampness or some cause arising from a defect in the place of storage. These facts justify a presumption of negligence on defendants' part. J. Russell Mfg. Co. v. New Haven Steamboat Co., 50 N. Y. 121; Ouderkirk v. Central National Bank of Troy, 119 N. Y. 263, 23 N. E. 875; Stewart v. Stone, 127 N. Y. 500, 28 N. E. 595, 14 L. R. A. 215; Wintringham v. Hayes, 144 N. Y. 1, 38 N. E. 999, 43 Am. St. Rep. 725.

The foregoing views lead to judgment for the plaintiff for the sum of $405, the stipulated value of the flour, with interest from December 20, 1910, but, as agreed in the submission, without costs. All concur.

---

### MacDONNELL v. PRESS PUB. CO.

(Supreme Court, Appellate Division, First Department. December 31, 1913.)

DISMISSAL AND NONSUIT (§ 71*) — DILIGENCE IN PROSECUTION — BURDEN OF PROOF.

Where it is moved to dismiss a complaint for unreasonable neglect to prosecute, the burden of establishing sufficient and reasonable grounds for delay is upon the plaintiff.

[Ed. Note.—For other cases, see Dismissal and Nonsuit, Cent. Dig. §§ 165, 166; Dec. Dig. § 71.*]

Appeal from Special Term, New York County.